J. CHARLES CARROLL, APPELLANT, v. MAY DEPARTMENT STORES, RESPONDENT.—180 S. W. (2d) 793.

St. Louis Court of Appeals. Opinion filed June 6, 1944.

Respondent's motion for rehearing overruled June 23, 1944.

Certiorari denied by Supreme Court September 5, 1944.

984

*Thompson, Mitchell, Thompson & Young* and *Richard D. Shew-maker* for appellant.

986

*Carter, Bull & Garstang* and *James E. Garstang* for respondent.

McCULLEN, J.—This action was brought by J. Charles Carroll, as plaintiff, against May Department Stores Company, as defendant, for damages resulting from injuries sustained by plaintiff's wife, Mrs. Signe A. Carroll, when she was struck on the head by a metal ash stand which fell from the eighth floor of defendant's store in the City of St. Louis. A trial before the court and a jury resulted in a verdict for plaintiff in the sum of $1500, but the trial court sustained defendant's motion for a new trial on the ground that plaintiff failed to make a case for the jury. From the order granting defendant a new trial plaintiff duly appealed.

The petition of plaintiff alleged that defendant operated a large department store located in a high building adjoining Seventh street between Olive street and Locust street in the City of St. Louis, Missouri; that defendant occupied, possessed, managed and controlled a large part of said premises, including several floors of the building; that on August 27, 1942, plaintiff's wife, Signe A. Carroll, was walking along Seventh street on the public sidewalk adjoining said premises beneath a part of said building, and that as a direct and proximate result of the negligence of defendant, and its failure to exercise reasonable care, a large and heavy metal ash stand fell from a part of said building occupied, possessed, managed and controlled by defendant, from a point a considerable distance above the sidewalk, and struck plaintiff's wife while she was walking, as aforesaid, and severely and permanently injured her. Plaintiff prayed damages in the sum of $3000.

The answer of defendant was a general denial.

No question is raised herein as to plaintiff's petition. Defendant concedes that it stated a cause of action under the *res ipsa loquitur* doctrine.

Plaintiff contends that the trial court erred in sustaining defendant's motion for a new trial, and in holding that he was not entitled to go to the jury under the *res ipsa loquitur* doctrine.

The evidence showed that defendant owned and operated a department store known as Famous-Barr Company. It occupied the first thirteen floors of a building known as the Railway Exchange Building, bounded on the west by Seventh street, on the south by Olive street, on the east by Sixth street, and on the north by Locust street, in the City of St. Louis, Missouri. In the southwest part of the eighth floor of its store defendant conducted its radio and phonograph record department.

Plaintiff's wife at the time of the trial was fifty-six years of age. She and plaintiff had resided in the City of St. Louis for about twelve and one-half years prior to the accident. On August 27, 1942, plaintiff's wife left her home for the purpose of making a visit to defendant's store. While she was upon the sidewalk on the east side of Seventh street adjoining defendant's store, and at a point just south of an electric light standard near Olive street, she was struck and injured by a metal ash stand of the same make and style as those used in the phonograph record listening rooms on the eighth floor of defendant's store.

An ash stand was introduced in evidence by plaintiff and marked plaintiff's Exhibit A. It was of the type that sits on the floor. Defendant admitted that said ash stand was recovered by the police at the place on the sidewalk where plaintiff's wife was struck; that it was procured from the Police Department by defendant's Superintendent of Protection and was similar in appearance to other ash stands in some of the listening rooms on the eighth floor of defendant's store. Defendant further admitted that Exhibit A was the ash stand that struck plaintiff's wife. Said Exhibit A weighed about six and one-half pounds. It was about twenty inches high overall. The rods connecting the base and the top part were sixteen inches long; the depth of the bowl was about three inches, and the diameter seven inches; the diameter of the base was eight inches. The lower part of the stand was slightly heavier than the top part.

Police Officer Henry Abeken testified on behalf of plaintiff that immediately after the accident he went through the offices in the southwest corner of the building on the floors above defendant's store and "looked and inquired from tenants," but "did not find any ash stand like this on the upper floors"; that he then examined the eighth and ninth floors, which were a part of defendant's store, and found on the eighth floor, in the rooms which were used by defendant

for customers to listen to phonograph records, ash stands similar to plaintiff's Exhibit A. Officer Abeken's testimony in this respect was corroborated by that of Mr. Zytowski, defendant's Superintendent of Protection, who was a witness for defendant. Officer Abeken further testified that, when he made his investigation on the day in question, there was an ash stand similar to plaintiff's Exhibit A in the southwest corner room on the eighth floor, and one in each of the other rooms except room 11, which was next to and north of room 10. The officer stated that the sidewalk on Seventh street, where plaintiff's wife was struck by the ash stand, was ''one of the busiest corners in town.''

Mervyn O. Jones, manager of defendant's phonograph record department, was called as a witness for plaintiff and testified that in the southwest corner of the eighth floor of the store, along the Olive street and Seventh street sides, there were rooms known as ''listening rooms'' for the use of defendant's customers to listen to the playing of popular music on phonograph records. These rooms were numbered from 1 to 13 inclusive. Ten of the rooms were on the Olive street side. Rooms 11, 12 and 13 were on the Seventh street side. The room in the southwest corner of the building was numbered 10. It had one window facing Olive street and one facing Seventh street. The room was equipped with a victrola on a small table, two chairs, and an ash stand similar to plaintiff's Exhibit A. The rooms were air-conditioned and soundproof. The floor dimensions of said listening rooms, including the one numbered 10, were about seven feet by eight feet, and about ten feet high. Each room had a glass door surrounded by a wooden frame. There was a counter in the record department on said floor that was about sixty-five feet long which ran parallel to the rooms on the Olive street side and was so arranged that a customer could walk between the counter and the doors to the listening rooms, but would have to go to the end of the counter near room 10 to do so. The space between the counter and said doors was about three or four feet. The phonograph records were kept by defendant within a square arrangement of counters in the center of the department, and clerks taking customers to one of the rooms to listen to popular music would go out of the square arrangement and along the Seventh street side of the building, near the entrance to room number 10, where they would turn to the left to go along the aisle between the sixty-five foot counter, heretofore referred to, and the listening rooms on the Olive street side. A clerk taking a customer to room 9, on arriving at a position in front of the door thereof, would be able, by looking slightly to the right, to see into room 10 and see the Seventh street window of that room. There was a glass window about twenty-four inches square between room 10 and room 9, and one of the same size between room 10 and room 11. Persons in rooms 9 and 11 could see the entire interior of room 10.

Mr. Jones further testified that the listening rooms were kept locked except when they were opened with keys by employees of defendant for the purpose of admitting customers. The doors locked automatically when closed and the customer could get out, but no one could get in without a key. On Tuesdays and Saturdays defendant had an employee on special duty to admit customers to the listening rooms. There was no employee on such special duty on the day in question —it being a Thursday. Defendant permitted the use of said popular listening rooms for only fifteen minutes at a time, and had rules prohibiting dancing in the rooms, but dancing took place in spite of the rules. The witness testified that defendant also had rules requiring the windows to be kept closed at all times, and it was the duty of defendant's employees upon observing open windows or dancing, or persons staying longer than the permitted time, to report to the witness, as manager of defendant's record department, and he would then undertake to correct the situation.

Further testimony by Mr. Jones was to the effect that the defendant company was "bothered considerably by jitterbugs." He stated that they would often stay over fifteen minutes and he would have to ask them to leave. "Jitterbugs" were described as persons from fifteen to eighteen years of age, that is, "the high school age." It was largely this class of customers who used the listening rooms on the Olive street and Seventh street sides of the building to listen to records playing popular music. On the day in question there were twelve or thirteen of defendant's clerks on duty in the department mentioned. The witness stated that the windows in room 10 were equipped with a mechanical device "so that they would not stay open when opened"; that, in order to hold them open, some one would have to prop something under them. The bottom of the windows in room 10 were about two and one-half feet above the floor.

On cross-examination Mr. Jones stated that he heard of the accident later on the day it happened, but made no inquiry among the employees that evening; that on the following morning the employees were asked about it but "no one seemed to know anything about it."

Robert L. Brown, an attorney at law with an office on the ninth floor of the Seventh street side of the building known as 705 Olive street, testified on behalf of plaintiff that on the afternoon in question he was in his office dictating to his stenographer; that his office was immediately across from the building in which defendant conducted its store; that his office was about on a level with the eighth floor of defendant's store; that as he sat in his office dictating his position was such that he was facing toward the eighth floor of defendant's building; that "I was concentrating on what I was doing, and as I dictate I usually stare out the window, as one would do in thought, and all of a sudden something attracted my attention. I saw something come out of that window—the end window of Famous-Barr on the

eighth floor, and as it came out I saw the window and blinds drop, and I said to my secretary, 'A woman fell out of that window.' " The witness further testified that he later learned it was not a woman who had fallen, but that an ash stand had fallen and had struck a woman who was on the sidewalk. He testified that he looked down from his office window and saw "a lady lying on the sidewalk near the lamppost," and "I could distinguish a red color which I presumed was blood." The witness was unable to state whether the object was sitting on the window sill before it fell. He testified that his attention was attracted by the object coming out of the window and falling, and the almost simultaneous closing of the window and the dropping of the blinds. The witness further testified that on many occasions prior to that time he had seen persons whom he described as "jitterbugs" sticking their heads out of the window; that he had seen paper coming out of the window and things of that nature; that he had seen a boy lose his hat one day as he was sticking his head out of the window; that the boy's hat blew off; that such things happened at times all the way from the middle of June to the time of the accident involved herein.

Defendant introduced in evidence a number of photographs showing interior and exterior views of various parts of its store described in the evidence. Plaintiff's witness Mr. Brown was shown defendant's Exhibit 4, which was a photograph of defendant's listening room 10 showing the Seventh street window thereof with a view of the window in the witness's office in the building opposite defendant's store, and stated that the window of room 10 shown therein was the one from which he had seen the object fall.

The evidence on behalf of defendant showed that at the time in question the windows in room 10 were equipped with a mechanical device so that they would not stay open. Considerable effort was required to open them, and, if a person raised the window and released his hold upon it, it would come down with considerable force.

The listening rooms had been built some time in 1940 and had been air-conditioned from that time on. Defendant at times had trouble with people opening the windows, which led defendant to make the rule against opening them, heretofore referred to. The devices on the windows in the listening rooms, to prevent them from remaining open without a prop, were installed by defendant, according to the testimony of Mr. Zytowski, defendant's Superintendent of Protection, because complaints had been made by the policeman on the corner that:

"Youngsters that would come in the rooms or people that would come in there would throw out—one time they said an apple, another time a banana, and I think a broken record on another occasion. In fact, I am sure it was a broken record that was supposedly thrown

out of that room, so we ordered those windows closed and an arrangement put on there so they could not be opened.

"Q. I mean this contraption whereby you could open them but they wouldn't stay open? A. That's right.

"Q. Is that the one you are speaking of? A. Yes, I had that done about May, 1942."

Mr. Zytowski, further testifying on behalf of defendant, stated that the windows in the listening rooms operated like any ordinary window except that they had chains instead of window cords; that the chains ran over pulleys at the top in the usual way; that the device which was put on "consisted of a coiled spring which was fastened to each chain at the top, so that if the window was raised the counter-weights would, because of the springs attached to the chains, be ineffective. In other words, a person wanting to raise the window would find it hard to raise because of the absence of effective counterweights, and if he did raise it the window would have to be propped open in order to keep it up." The witness stated that on the day of the accident, and shortly after it happened, he and a police officer tried the window in listening room number 11 and could not open it. They then tried the Seventh street window in room number 10 and were able to open it. At that time they found one safety fastener had been removed from said window and was lying on the top of the lower sash. The witness further testified that in September, 1942, after the accident involved herein, he had put on the windows in question with a special kind of screw so that the windows could not be opened at all except with a "special screw driver."

On cross-examination the witness testified:

"Q. Why didn't you put fasteners on those windows to prevent them from opening at all at the time you put those springs on? A. Because we thought those would do it, if we released the action of the weights, the counter-balance weights, we supposed that they would be closed and remain closed.

"Q. You knew someone could raise them if they exerted sufficient force? A. Well, I suppose if we had stopped to think of it we could have known that."

Melba Suzanne Kesner testified on behalf of defendant that at the time of the accident she was in the employment of defendant as head of stock in the phonograph record department; that she heard about the accident after it occurred. Referring to the listening rooms, she stated:

"Those rooms were mediumly busy and occupied that afternoon. Room 10 was not occupied that afternoon at all times. It was part of the time. Earlier than about 2:30 to 3 o'clock I remember two boys in there and Mr. Zytowski asked their names and I didn't know their names in full, and I caught them after I sent the boys in again and

he talked to them. I mean Mr. Zytowski talked to the boys I mentioned.

"Mr. Garstang: I didn't know that. I'll put him back on. Is he still here?

"The Court: Yes.

"The Witness: They were boys that came in all day long, that just stayed in the department throughout the day."

At the conclusion of the testimony of the last-named witness Mr. Zytowski was recalled to the stand and, referring to said witness, testified:

"She did not point out any boy to me that I talked to that day. She told me of some boys the next day. I did not talk to any boys she told me about. I did not talk to them. I do not know of anyone that did talk to some boys who had been in one of those rooms.

"Q. Did you know Officer Wren, the police officer? A. Tom Wren?

"Q. Yes. A. Yes, I do. He died here a few weeks ago. He had some interviews in connection with the case. I do not know what they were because I was not present. He is dead. He died just a short time ago, about two months ago."

Plaintiff introduced testimony with respect to the nature and extent of his wife's injuries, but such testimony is not involved in the questions raised upon this appeal.

Plaintiff contends that he made a typical *res ipsa loquitur* case by showing that an ash stand belonging to defendant fell from its store in an unexplained manner and struck his wife while she was walking on the sidewalk below. In opposition to plaintiff's contention defendant insists that plaintiff's evidence eliminated the applicability of the *res ipsa loquitur* doctrine by showing that defendant did not have control of the instrumentality involved at the time in question; that plaintiff's evidence showed a lack of superior knowledge or means of information on the part of defendant as to the cause of the occurrence; that plaintiff's evidence was such that an inference could as reasonably have been drawn that the accident was due to a cause or causes other than a negligent act of defendant and left the matter to speculation; and that plaintiff's evidence pointed logically to the act of a customer or third person putting the ash stand in question to some unanticipated, unusual and extraordinary use without notice, either actual or constructive, to defendant, so as to cause the ash stand to fall.

In granting defendant a new trial the trial judge filed a memorandum in which he stated that the rule of *res ipsa loquitur* "is inapplicable because plaintiff's evidence showed the equal likelihood that the fall of the ash stand described in the evidence was the result of a cause for which defendant could not be liable, the intervention of third persons, and of a cause for which defendant would be liable, its own negligence. . . . Plaintiff offered evidence in his case through

plaintiff's witness Jones, which establishes the probable intervention of the third persons, the customers of defendant, for whose misconduct or negligence the defendant could not be liable. Since plaintiff's own evidence established the two possible causes of the casualty, and since the testimony as to the intervention of the third persons did not come from defendant's witnesses alone, plaintiff was in the same situation as was plaintiff in the case of Hart v. Emery-Bird-Thayer Dry Goods Company, 118 S. W. (2d) 509, 511.''

The parties herein have cited a large number of cases decided by the courts of this State, as well as decisions by the courts of other states, to support their respective contentions. We have carefully read the cases cited but will not undertake to review and analyze them in this opinion. Such a review would only add another to the long and ever growing list of opinions containing repetitious reviews of cases involving the doctrine under discussion and would unnecessarily lengthen this opinion. Moreover, it is well established that the applicability or nonapplicability of the *res ipsa loquitur* doctrine to a particular case must be determined by the facts and circumstances of such case.

The expression ''*res ipsa loquitur*,'' according to all legal dictionaries, means, literally, ''The thing speaks for itself.'' A clear statement of the doctrine (also referred to as rule) appears in 38 Am. Jur., Negligence, Sec. 295, as follows:

''The conclusion to be drawn from the cases as to what constitutes the rule of *res ipsa loquitur* is that proof that the thing which caused the injury to the plaintiff was under the control and management of the defendant, and that the occurrence was such as in the ordinary course of things would not happen if those who had its control or management used proper care, affords sufficient evidence, or, as sometimes stated by the courts, reasonable evidence, in the absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care. Hence, the occurrence of an injury under the circumstances as set forth permits an inference, or in the terminology of some courts, raises a presumption, that the defendant is guilty of negligence.''

The doctrine of *res ipsa loquitur* was applied in the early case of Byrne v. Boadle (Court of Exchequer, 1863), 2 H. & C. 721, 159 English Reports Reprint 299. In that case a witness testified that as he was going along a road adjoining defendant's shop and had reached a point opposite the shop, a barrel of flour fell from a window above defendant's shop and knocked plaintiff down; that a horse and cart came opposite defendant's door and barrels of flour were in the cart. Referring to the barrel that struck plaintiff, the witness said: ''I do not think the barrel was being lowered by a rope. I cannot say. I did not see the barrel until it struck the plaintiff. It was not swinging when it struck the plaintiff.'' The

plaintiff therein testified that "On approaching Scotland Place and defendant's shop, I lost all recollection. I felt no blow. I saw nothing to warn me of danger. . . . I was helpless for a fortnight. I saw the path clear. I did not see any cart opposite defendant's shop." Another witness testified: "I saw a barrel falling. I don't how how, but from defendant's." The only other witness who testified was a surgeon who described plaintiff's injuries. It was admitted that defendant was a dealer in flour. The court, speaking through POLLOCK, C. B., said (Reprint, *supra*, l. c. 301):

"We are all of the opinion that the rule must be absolute to enter the verdict for the plaintiff. The learned counsel was quite right in saying that there are many accidents from which no presumption of negligence can arise, but I think it would be wrong to lay down as a rule that in no case can presumption of negligence arise from the fact of an accident. Suppose in this case the barrel had rolled out of the warehouse and fallen on the plaintiff, how could he possibly ascertain from what cause it occurred? It is the duty of persons who keep barrels in a warehouse to take care that they do not roll out, and I think that such a case would, beyond all doubt, afford *prima facie* evidence of negligence. A barrel could not roll out of a warehouse without some negligence, and to say that a plaintiff who is injured by it must call witnesses from the warehouse to prove negligence seems to me preposterous. . . . The present case upon the evidence comes to this, a man is passing in front of the premises of a dealer in flour, and there falls down upon him a barrel of flour. I think it apparent that the barrel was in the custody of the defendant who occupied the premises, and who is responsible for the acts of his servants who had the control of it; and in my opinion the fact of its falling is *prima facie* evidence of negligence, and the plaintiff who was injured by it is not bound to show that it could not fall without negligence, *but if there are any facts inconsistent with negligence it is for the defendant to prove them.*" [Byrne v. Boadle, *supra*.] (Emphasis ours.)

The above-mentioned case was cited with approval by this court in Gallagher v. Edison Illuminating Co.; 72 Mo. App. 576, wherein plaintiff, a driver of a delivery truck, was struck upon the head and rendered unconscious by the fall of an arc lamp at the intersection of two streets in the City of St. Louis. The doctrine *res ipsa loquitur* was held to be applicable and the judgment for plaintiff affirmed.

The leading case in Missouri involving the doctrine of *res ipsa loquitur* is McCloskey v. Koplar, which was decided by our Supreme Court (en banc) and is reported in 329 Mo. 527, 46 S. W. (2d) 557. In that case plaintiff, a twelve-year-old boy, brought suit to recover damages for injuries sustained by him when a radiator, which had been detached from the heating system of defendants' theatre and was standing in an aisle of the theatre. tipped over and fell upon

plaintiff and broke his leg. The cause was tried and resulted in a verdict and judgment for plaintiff and defendants appealed. The evidence at the trial showed that the radiator when connected with the heating system of the theatre had stood in a recess in a wall of the theatre. The evidence did not show when or by whom the radiator had been moved to the position in the aisle where it was when it fell over and injured plaintiff. There was evidence showing that the radiator had been standing by the wall, out of its regular position in the recess, for about a week before the accident and on another occation three days before the accident. The evidence also showed that a heating company had been overhauling and repairing the radiators in the theatre a week before the accident, and that after the accident some of the radiators were found to have been disconnected. A number of witnesses for the defendants testified that the radiator in question had been in its proper place an hour before the accident happened. Testimony by defendants' manager was to the effect that he had given no orders for the removal of the radiator. The manager also testified that he heard an unidentified person say just after the accident that some boys had dragged the radiator out and had used it for a seat. The contention of defendants was that there was no evidence that they had actual or constructive notice of the dangerous situation of the radiator and therefore the *res ipsa loquitur* rule did not apply to the case because it was probable that the radiator might recently have been moved· to its dangerous position by some third person without defendants' actual or constructive knowledge, and that this was especially true in defendants' theatre which crowds visited hourly. Answering the contention of the defendants (appellants) therein, the court said:

"In our opinion appellants' theory as set out in the foregoing paragraphs cannot be sustained, though we concede the general propositions of law on which authority is cited are sound. This case is of a class in which the doctrine of *res ipsa loquitur* is frequently invoked, so far as such cases are susceptible of classification. *It comes within the category of falling objects to which the rule is very generally applied.*" [McCloskey v. Koplar, 329 Mo. 527, 534, 46 S. W. (2d) 557, 560.] (Emphasis ours.)

In discussing the contentions of defendants therein, the court gave its approval to a statement of the scope and limitations of the doctrine, as follows:

"In general and on principle the doctrine *res ipsa loquitur* does not apply except when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence." [McCloskey v. Koplar, 329 Mo. 527, 533, 46 S. W. (2d) 557, 559.]

The foregoing statement of the doctrine has been cited many times, not only by all the appellate courts of this State, but by courts of last resort throughout the nation, as well as by text writers on the subject of negligence.

In further elucidation of the doctrine, the court said:

"And the requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but *refers rather to the right of control at the time the negligence was committed.*" [McCloskey v. Koplar, 329 Mo. 1. c. 535, 46 S. W. (2d) 1. c. 560.] (Emphasis ours.)

Following the above language the court referred to the case of Van Horn v. Pacific Refining & Roofing Co., 27 Cal. App. 105, 148 Pac. 951, 953, and quoted with approval from said California case the following:

"The rule . . . to the effect that the exclusive control and management of the appliance causing the injury must be shown to have been in the defendant, *must be taken to refer to the right of such control*; otherwise . . . the doctrine of *res ipsa loquitur* could seldom if ever be given application." (Emphasis ours.)

In holding that the plaintiff in the McCloskey case, *supra,* had made a case for the jury under the *res ipsa loquitur* doctrine, the court, after a review of the evidence, said:

"The radiator was the property of the appellants and was a part of the equipment of the theatre under their control and management. The were *primâ facie* responsible for the dangerous situation, whoever may have moved the radiator. As said in the Schmidt Case last cited: '*The same rule, res ipsa loquitur, that shifts the burden of evidence upon the point of negligence, also shifts the burden of evidence upon the point of the identity of the party legally responsible, and calls upon the owner to overcome the presumption against it arising out of its ownership, custody, and general* control of the building.' " [McCloskey v. Koplar, 329 Mo. 1. c. 535, 46 S. W. (2d) 560.] (Emphasis ours.)

Later cases decided by our Supreme Court and our Courts of Appeal involving the doctrine mentioned, and holding that said doctrine did or did not apply to the facts of a particular case, are helpful as examples, but ultimately we must determine whether this case comes within the doctrine by looking to the facts shown in this record.

Having in mind the principles of law declared in the McCloskey case, *supra,* we are of the opinion that the trial court, in the case at bar, erred in holding that plaintiff failed to make a case for the jury under the *res ipsa loquitur* doctrine. We do not agreed with the view urged by defendant that plaintiff's evidence and proof were such that an inference could as reasonably have been drawn that the accident was due to a cause or causes other than a negligent act of

defendant and left the matter to speculation. Nor can we give our approval to the argument that the evidence showed there was an equal probability of a cause of the injury for which defendant was not legally responsible and a cause for which defendant was legally responsible, and that plaintiff's own evidence established said two possible causes. The evidence, considered as it must be, from the view most favorable to plaintiff, shows that plaintiff's wife was struck by a metal ash stand which fell from a window in defendant's store; that defendant had the exclusive right of control, not only over the instrumentality which caused the injury, but also over the room and the window from which it fell. Defendant lays stress upon the fact that its listening rooms were frequented by "jitterbugs" and that it was equally probable that a "jitterbug" or third person caused the ash stand to fall from the window as that defendant or some employee of defendant caused it to fall. We believe that the evidence does not support that view.

Mr. Jones, defendant's record department manager who was called as a witness for plaintiff and whose testimony is claimed by defendant to have destroyed plaintiff's *prima-facie* case under the *res ipsa loquitur* doctrine, gave no testimony, either directly or from which it could be inferred, that any "jitterbug" or third person occupied room 10 immediately before or at the time of the accident. Mr. Jones merely testified that, under the general practice, "jitterbugs" or third persons used the listening rooms involved herein; that before a customer could get in to one of said rooms it would be necessary to have the door thereof unlocked by one of defendant's employees; that on the day in question no particular employee was designated for that duty and any one of the employees in the department would unlock the doors to permit patrons to enter said rooms. On cross-examination Mr. Jones said: "We have no way of knowing what particular people, patrons of the store, used that room that afternoon; absolutely not."

There is no testimony whatsoever in the record showing that a "jitterbug" or any third person was in room number 10 at the time of or immediately preceding the accident. According to the testimony of Police Officer Ryan the accident happened at 2:40 P. M. on the day in question. The only testimony as to the presence of third persons in room 10 at any time on the afternoon in question came from defendant's witness Melba Kesner, who stated that she heard of the accident after it occurred and that said room was not occupied that afternoon at all times; that "earlier than about 2:30 to 3 o'clock" she remembered two boys in there and spoke to Mr. Zytowski about them. This was denied by Mr. Zytowski.

Against a total lack of evidence to show the presence of any third person in room 10 immediately preceding or at the time of the accident is the conclusive evidence that no one could enter any of said rooms

without a key and that only defendant's employees had keys to the rooms.

Defendant's contention that some "jitterbug" or third person was in room 10 at the time of the accident is thus seen to be based upon a mere guess with no evidence to support it. Such a guess or conjecture does not rise to the dignity of a probability. In view of the conceded fact that the only persons who could enter room 10 were employees of defendant, or third persons accompanied by an employee, and there being no evidence of any such third person's presence therein immediately before or at the time of the accident, we think that the only reasonable probable cause of the injury shown by the evidence was one for which defendant was and is responsible. Such a reasonable probability was of sufficient strength to require defendant, under the *res ipsa loquitur* doctrine, as declared in the McCloskey case, *supra,* to come forward with evidence to show, if it could, that none of its employees caused said stand to fall, or such other defense as it might have. The many cases cited by defendant holding that proof of two equally probable causes of an injury, for one of which defendant is liable and for the other not liable, have no application to this case for we have no such situation in this record.

Defendant's contention that plaintiff's own evidence established two possible causes of the casualty, one for which defendant would be liable and the other for which it would not be liable, necessarily means that defendant concedes that plaintiff made a *prima-facie* case under the *res ipsa loquitur* doctrine. Defendant argues, however, that plaintiff went too far and destroyed his *prima-facie* case by proving another cause of the injury for which defendant could not be held liable. We have shown that the record does not support such contention. Therefore, any such holding as defendant contends for would be in direct conflict with the doctrine of McCloskey v. Koplar, *supra,* which expressly ruled that the *res ipsa loquitur* doctrine shifts the burden of evidence upon the point of negligence and upon the point of the identity of the party legally responsible, and "calls upon the owner to overcome the presumption against it arising out of its ownership, custody and general control of the building." [McCloskey v. Koplar, *supra.*]

We hold that plaintiff was entitled to have his cause submitted to the jury under the *res ipsa loquitur* doctrine. As we view it, the case is within the principles laid down in McCloskey v. Koplar, *supra.* The evidence showed that there was: (a) an occurrence resulting in injury to plaintiff's wife which was such as does not ordinarily happen if those in charge of the instrumentality causing the injury use due care; (b) the instrumentality involved was under the management and control of the defendant; and (c) the defendant possessed superior knowledge or means of information as to the cause of the occurrence.

1000

The case of Hart v. Emery-Bird-Thayer Dry Goods Co., 233 Mo. App. 312, 118 S. W. (2d) 509, cited by the trial judge and relied on by defendant herein, is, in our opinion, distinguishable on its facts from the case at bar. The Hart case was an action by a customer against a department store for injuries sustained when awnings, which were piled on a table for display purposes in defendant's basement, fell and struck the customer. The evidence therein showed that the awnings were about thirty-six inches in width and that they were lying across a table in layers. The table was about the same width as the awnings. A number of people were in the basement at the time and it was the practice for customers themselves to examine such merchandise, and, if they did not like it, to put it back on the table. As plaintiff approached the table two of the awnings rolled off and struck her. The court held that the *res ipsa loquitur* doctrine did not apply. In reaching its conclusion the court quoted from Guttman v. F. W. Woolworth Co., 159 Misc. 821, 288 N. Y. S. 819, as follows:

"'If liability is to attach in this case, then there is a duty upon the defendant to constantly inspect merchandise similarly displayed. This would constitute an unreasonable burden.'" [Hart v. Emery-Bird-Thayer Dry Goods Co., 233 Mo. App. 312, 318, 188 S. W. (2d) 509, 512.]

We believe that the above Hart case is not applicable to the case at bar because of the wide difference in the facts of the two cases.

On the facts in evidence herein, the case of McCloskey v. Koplar, *supra*, is the controlling authority by which we must be governed in our decision.

The judgment is reversed and the cause remanded with directions to the trial court to reinstate the verdict for plaintiff and enter judgment thereon. *Hughes, P. J.*, and *Anderson, J.*, concur.